IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| CURTIS COX, | ) |
| | ) |
| Plaintiff, | ) Civil No. 1:16-cv-9 |
| | ) |
| v. | ) Hon. Liam O'Grady |
| | ) |
| SNAP, INC., | ) |
| | ) |
| Defendant. | ) |

### Memorandum Opinion

This matter now comes before the Court on cross-motions for summary judgment by Defendant Snap, Inc. ("Snap") and Plaintiff Curtis Cox ("Cox"). Dkt. Nos. 84 & 91. The Motions have been fully briefed and the Court held a hearing on the Motions on September 9, 2016. For the reasons outlined below, the Court finds good cause to GRANT Cox's Motion for Summary Judgment and DENY Snap's Motion for Summary Judgment.

### I.   BACKGROUND

In 2006, Snap was a small business looking to grow in the government contracting community. At that time, Cox was a well-known figure in the industry. He was also the President of $C^2$, an established government contractor.

Snap proposed a strategic business relationship under which Cox would provide assistance promoting and marketing Snap in exchange for an option representing five percent of Snap's total authorized shares. The terms of the proposed agreement were set out in a Letter

1

Agreement (or "memorandum of understanding") dated January 12, 2006, from Navneen Gupta, Snap's President, to Cox and C² (the "Letter Agreement"). The letter instructed, "[i]f you [Cox] are in agreement with these terms, please sign below and we [Snap] will prepare the necessary documentation."

Paragraph 1 of the Letter Agreement described the stock option Cox was to receive. It provided:

> Snap currently has 4,926 shares issued and outstanding and an additional 1,232 shares, representing twenty (20%) percent of the authorized shares, reserved for key employees, strategic partners, and contractors. On January 12, 2006, Snap will issue a non-qualified stock option to Mr. Cox granting him the right to purchase 308 shares, representing five (5%) percent of the total authorized shares of stock of Snap. Snap intends to execute a stock split in the near future and the number of shares subject to Mr. Cox's option will increase proportionally.

The following paragraphs set forth terms and conditions that would apply to the stock option transfer. Paragraph 3 stated: "Except as set forth in this Memorandum of Understanding and the final agreement, the options will be otherwise subject to the terms of Snap's stock option plan." In addition, Paragraph 6 stated that "[t]he options will be fully vested when granted."

In return for these shares, Cox and C² agreed to take a number of actions to assist Snap. For example, they agreed to provide "resources valued at approximately $240,000 [during 2006] to be used in the areas of marketing support and assistance or as otherwise requested by Snap." They also agreed to "consider Snap for any potential leads that they encounter for work requiring an 8(a) company," "use their best efforts to help Snap obtain the BOA contract and become registered with the U.S. Army NRCC," and "give Snap the opportunity to bid for the work" if C² was a primary contractor, along with other partnership-related provisions.

The Letter Agreement also contained repurchase provisions for the stock options. Snap was able to repurchase the option any time after January 1, 2008, and Cox could require Snap to

repurchase the options any time after January 1, 2011.[1] The Letter Agreement set forth a formula by which to calculate the strike price[2] and the final repurchase amount. Specifically, it stated: "For the purposes of determining the strike price of the options issued pursuant to Paragraph 1, the value of Snap will be based on a valuation of .8 times Snap's sales in calendar year 2005. This amount is estimated to be approximately $12,000,000."

Relatedly, Paragraph 10 of the Agreement governed the redemption of Cox's shares:

> 10. Mr. Cox shall have the ability to require the Company to purchase his options at any time subject to the foregoing:
> (a) Mr. Cox cannot exercise this put option prior to January 1, 2011.
> (b) The price shall be determined based on the excess of the then fair market value of Snap, with such value determined based on .8 times Snap's annual sales during the most recently preceding twelve-month period, in excess of the initial strike price.
> (c) The repurchase amount is payable by Snap to Mr. Cox over a five-year period with interest at the then current prime rate.

The Letter Agreement concluded by saying: "If these terms are acceptable, please sign below and we will begin preparing the necessary documents." The letter was executed by Cox and Gupta.

On March 18, 2011, Cox sent a letter to Gupta exercising his right to have Snap repurchase his options. The letter stated, "I hereby exercise my right under section 10 of the Agreement to require Snap to purchase all of my Options." On March 28, Gupta emailed Cox and offered to "negotiate a resolution of your option claims." The parties were unable to reach a resolution. In October 2015, Cox again raised the issue of Snaps repurchase obligations. On October 9, 2015, Gupta responded, saying: "Snap owes you nothing."

---

[1] This is known as a put option—"[a]n option to sell something (esp. securities) at a fixed price even if the market declines; the right to require another to buy." *Black's Law Dictionary* (10th ed. 2014).

[2] A "strike price" is "[t]he price for which a security will be bought or sold under an option contract if the option is exercised." *Black's Law Dictionary* (10th ed. 2014).

3

At the time the parties executed the Letter Agreement, Snap had three owners: Vivek Bali, Navneet Gupta, and Inderbir Singh. At some point, Gupta decided to buy out Bali and Singh. During the buyout negotiations, Gupta accounted for the fact that the owners "had to deduct the value of Mr. Cox's stock options from the buyout and separation agreement." The formal separation documents, executed on April 13, 2011, stated: "The Company has previously promised options to Curtis Cox for 308,000 shares, which are presently the subject of unwinding negotiations." Email communications between the parties similarly referenced the share transfer contemplated by the Agreement. In January 2006, Snap's attorney, Larry Stern, sent the following message to Gupta on January 31, 2006: "We're in the process of putting together documents to recapitalize the company to have 10 million shares authorized and then a stock split so that the 3 of you will have 4,926,000 shares outstanding and then we'll issue options for up to 1,232,000, with Mr. Cox owning 308,000 of them." On the same day, Gupta forwarded this email to Cox.

## II. PROCEDURAL HISTORY

In November 2015, Cox filed suit against Snap in Fairfax County Circuit Court alleging breach of contract. Snap removed the suit to federal court on the basis of diversity jurisdiction and moved to dismiss for failure to state a claim. While the motion to dismiss was pending, Cox filed an amended complaint and the Court subsequently dismissed Snap's motion as moot. In response, Snap filed a new motion to dismiss, which was denied. The amended complaint alleges three counts: (1) breach of contract for failure to repurchase (Count I); (2) alternatively, breach of contract for failure to issue the options (Count II); and (3) alternatively, quantum meruit (Count III). Cox seeks $1,000,000 in damages.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment has the initial burden of showing the court the basis for its motion and identifying the evidence that demonstrates the absence of a genuine issue of material fact. *Id.* Once the moving party satisfies its initial burden, the opposing party has the burden of showing, by means of affidavits or other verified evidence, that there exists a genuine dispute of material fact. *See Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *see also Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir.1997) ("To avoid summary judgment, the non-moving party's evidence must be of sufficient quantity as to establish a *genuine* issue of material fact for trial.") (emphasis in original). A dispute of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party . . ." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, "[f]anciful inferences and bald speculations of the sort no rational trier of fact could draw or engage in at trial need not be drawn or engaged in at summary judgment." *Clinchfield Coal Co.*, 124 F.3d at 640. To defeat a

5

summary judgment motion, the existence of specific material evidentiary facts must be shown. *Ash v. United Parcel Service, Inc.*, 800 F.2d 409, 411–412 (4th Cir.1986).

## IV. DISCUSSION

These cross-motions present two principal questions for the Court to consider. First, does Paragraph 1 of the Letter Agreement impose a duty on Snap to issue stock options to Cox, or is it better understood as a condition precedent to the redemption of Cox's stock options? Second, if the language represents an obligation rather than a condition precedent, when and how did Snap breach that obligation?

### A. The Letter Agreement Does Not Contain a Condition Precedent

The parties agree that Virginia substantive law governs this diversity action. In Virginia, a claim for breach of contract requires: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004). Parties in Virginia are free, however, to "specify . . . events or pre-conditions that will trigger a party's right to recover for the other party's breach of their agreement." *Ulloa v. QSP, Inc.*, 624 S.E.2d 43, 48 (Va. 2006).

Thus, whether an act or event provided for in a contract is a condition or an independent duty or promise is often essential to determining whether an action for breach of contract exists. *See United States ex rel. Va. Beach Mech. Servs., Inc. v. SAMCO Constr. Co.*, 39 F. Supp. 2d 661, 672 (E.D. Va. 1999) ("The difference between a promise and a condition precedent is significant, of course."). That is because the "[p]erformance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused." Restatement

(Second) Contracts § 224 (1981); *see also Winn v. Aleda Constr. Co.*, 315 S.E.2d 193, 195 (Va. 1984) ("When a contract provides for the performance of special conditions precedent before a party [must perform its obligation], the conditions must be performed unless the other party prevents or waives their performance."). Generally, the "[n]on-occurrence of a condition is not a breach by a party." Restatement (Second) of Contracts § 225. By contrast, the non-performance of a promise gives rise to a claim for breach and damages. *See* 8-30 Corbin on Contracts § 30.12 (2015) ("A promise in a contract creates a legal duty in the promisor and a right in the promisee; the fact or event constituting a condition creates no right or duty and is merely a limiting or modifying factor.").

As an empirical matter, conditions and promises "are very clearly different in character." *Id.* "One who makes a promise thereby expresses an intention that some future performance will be rendered and gives assurance of its rendition to the promisee." *Id.* "[A] condition is a fact or event and is not an expression of intention or an assurance." *Id.*; *see also* Restatement (Second) Contracts § 224 (defining "condition" as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due"); *Black's Law Dictionary* (10th ed. 2014) (defining "condition precedent" as "[a]n act or event, other than the lapse of time, that must exist or occur before a duty to perform something arises"). General rules of contract interpretation govern whether parties intended a provision to be a condition or a promise. In Virginia, the plain meaning of the contract controls and parol evidence may be considered only upon a determination that the contract contains latent ambiguity. *Lott v. Scottsdale Ins. Co.*, 827 F. Supp. 2d 626, 631 (E.D. Va. 2011).

"There are also some special standards of preference that are of particular applicability to conditions." Restatement (Second) Contracts § 226 cmt. a. "When . . . it is doubtful whether or

not the agreement makes an event a condition of an obligor's duty, an interpretation is preferred that will reduce the risk of forfeiture." *Id.* § 227 cmt. b; Williston on Contracts § 38:13 (identifying a judicial "disinclination to find a condition"). The Fourth Circuit has characterized the preference as "generally accepted law." *Howard v. Fed. Crop. Ins. Corp.*, 540 F.2d 695, 697 (4th Cir. 1976); *see also Standefer v. Thompson*, 939 F.2d 161, 164 (4th Cir. 1991) ("Although we agree with the appellant that the law generally does not favor conditions precedent, we may certainly construe a contract as conditional if its plain language compels us to do so."). Thus, it must be the case that the plain language compels that construction. *See Va. Beach Mech. Servs., Inc.*, 39 F. Supp. 2d at 673 (stating where it is doubtful if language creates a condition, "courts generally construe terms in a contract as a promise").

While there is "[n]o particular form of language . . . necessary to make an event a condition," Restatement (Second) Contracts § 226 cmt. a, certain words and phrases are often used to signal the intent to make an event or act a condition. *Standefer*, 939 F.2d at 164. For example, parties typically include language like, "on condition that," "provided that," "if," "when," "after," "as soon as," or "subject to." *Id.*; *cf. Chesapeake Square Hotel*, 995 F. Supp. 2d at 518 (finding a condition where the contract contained a section titled "Conditions Precedent to Purchasers' Obligation" and "expressly identifie[d] numerous conditions precedent, many of which require Purchaser to obtain insurance, city approvals, permits, and licenses"); *Gulati*, 805 F. Supp. at 370 (noting the "contract explicitly conditioned Coyne's obligation to purchase on the satisfaction of a number of contingencies" and used the phrase, "expressly contingent on").

Applying this law, Paragraph 1 of the Letter Agreement represents a promise to grant Cox stock options, and not a condition precedent to Cox exercising his options. As an initial matter, the Agreement does not contain any prototypical conditional language, and its absence

8

"suggests that the parties intended a promise, rather than a condition." Williston on Contracts § 38:16. Though the absence of this language is not dispositive, there is also no other indication that Snap's failure to draft additional "options papers" or "necessary documentation" was intended to excuse Snap's obligation under the put option. In other words, even though the Letter Agreement may contemplate additional actions by the parties, the plain language of the Letter Agreement does not *compel* the characterization of that language as conditional; and where it is doubtful that contract language creates a condition, "courts generally construe terms in a contract as a promise." *Va. Beach Mech. Servs., Inc.*, 39 F. Supp. 2d at 673.

Moreover, a reading of the full contract lends support to the conclusion that Snap promised to issue shares to Cox. In examining the structure of the Agreement, it is apparent that Paragraph 1, which grants Cox his stock options, appears as an independent and detailed clause of the contract. It does not reference any other clauses, nor does it contain any qualifying language. Instead, it provides information on Snap's issued and outstanding shares, calculates the shares that it "will issue" to Cox (in percentage and numerical form), and explains what will happen to those shares in the event of a stock split in the future. In describing these obligations, the contract does not tie the option grant to any other rights, obligations, or actions, but instead imposes a separate and distinct duty on Snap.

By contrast, Cox's purchase option *is* subject to an explicit temporal condition precedent, but one that was fulfilled. Paragraph 10 of the Letter Agreement reads: "Mr. Cox shall have the ability to require the Company to purchase his options at any time *subject to the foregoing*: (a) Mr. Cox cannot exercise this put option prior to January 1, 2011 . . . ." (emphasis added). The remaining subsections (b) and (c) deal with the valuation of the put option and the payment of the put option, respectively. This clause is instructive because it shows that the parties knew

9

how to draft a condition precedent. Paragraph 10 makes it perfectly clear that Cox has no right to redeem his shares until January 1, 2011. Importantly, that is the only explicit condition contained in this clause. If Snap was required to separately issue options to Cox before Cox could redeem those options, Paragraph 10 would be the logical place to insert such a condition. The absence of any such language in the Agreement is telling and supports the conclusion that Paragraph 1 contains a promise and not a condition precedent.

### B. Cox Has a Right to Redeem His Shares

Having determined that Snap was obligated to issue Cox stock options on January 12, 2006 in accordance with Paragraph 1 of the Letter Agreement, the next question is: did Snap ever issue those shares? Snap argues that it never issued the options and that it therefore breached its promise to do so on January 12, 2006. If this is the case, it would mean that Cox never had options to redeem. Consequently, Cox's five-year statute of limitations would have expired in January 2011, more than four years before he filed his complaint. *See* VA. CODE ANN. § 8.01-246. Cox responds by asserting that Snap issued him the stock options on January 12, 2006, either orally or through the Letter Agreement itself, and that therefore Snap's breach could not have occurred until January 2011, when he first became eligible to redeem the shares.

After considering the contract and the evidence in this case, the Court finds that Snap issued Cox 5% of its shares on January 12, 2006 through the Letter Agreement. Thus, Snap breached its obligation to pay for the put option when Cox sent his share-redemption letter on March 18, 2011. It is therefore liable to Cox for its breach.

In Virginia, the plain meaning of a contract controls the interpretation of a contract unless its language is ambiguous. *Va. Elec. & Power Co. v. Norfolk S. Ry. Co.*, 278 Va. 444, 460 (2009). "An ambiguity exists when the contract's language is of doubtful import, is susceptible

of being understood in more than one way or of having more than one meaning, or refers to two or more things at the same time." *Id.* There are two types of ambiguities: patent ambiguities and latent ones. Patent ambiguities occur when multiple interpretations are apparent from the face of the document. *Lott v. Scottsdale Ins. Co.*, 827 F. Supp. 2d 626, 631 (E.D. Va. 2011). On the other hand, an "ambiguity is latent where the language in question appears 'perfectly clear' at the time of contract formation, but owing to 'subsequently discovered or developed facts, may reasonably be interpreted in either of two ways.'" *Lott v. Scottsdale Ins. Co.*, 827 F. Supp. 2d 626, 631 (E.D. Va. 2011) (quoting *Va. Elec. & Power Co.*, 278 Va. at 460).

The distinction between ambiguities is important. When a latent ambiguity exists, litigants may use extrinsic parol evidence to support their claims. *See S. Ins. Co. of Va. v. Williams*, 263 Va. 565, 570 (2002). When the ambiguity is patent, however, the parties may not use extrinsic evidence, and the ambiguities are generally construed against the drafter of the document because the drafter is deemed responsible for creating the ambiguity as a result of his careless drafting. *See Lott*, 827 F. Supp. 2d at 632; *see also Martin & Martin, Inc. v. Bradley Enterprises, Inc.*, 256 Va. 288, 291 (1998) ("[D]efendants argue that if an ambiguity exists in the agreement, such ambiguity must be resolved in their favor because the plaintiff drafted the purportedly ambiguous provisions. We agree . . ."). Thus, the applicable canon of contractual interpretation may vary depending on the category of ambiguity at issue.

In addition to those contractual principles, the resolution of this dispute is guided by the provisions of Virginia law that govern stock transfers. The Virginia Code states: "Shares may but need not be represented by certificates. Unless this chapter or another statute expressly provides otherwise, the rights and obligations of shareholders are identical whether or not their

shares are represented by certificates." VA. CODE ANN. § 13.1-647(A). Moreover, oral contracts for the transfer of shares are valid and enforceable. *See Andrews v. Sams*, 233 Va. 55, 58 (1987).

In this case, a plain reading of the contract evinces the parties' intent to deliver Cox's options when the Letter Agreement was signed. In relevant part, Paragraph 1 of the Agreement states that: "*On January 12, 2006, Snap will issue* a non-qualified stock option to Mr. Cox granting him the right to purchase 308 shares, representing five (5%) percent of the total authorized shares of stock of Snap" (emphasis added). Read in isolation, this sentence has the potential to cause confusion because the date that the contract is signed is the same date that the shares were supposed to issue. This could cause the reader to wonder what time on January 12 Snap was required to issue the shares and whether any additional action was required to effect the transfer. A review of the contract as a whole, however, resolves any ambiguity.

The share redemption provisions in the Letter Agreement help clarify the contractual language. As discussed above, Paragraph 10 states that Cox "shall have the ability to require the company to purchase its options *at any time*" subject to three explicit conditions: (1) a date restriction; (2) a valuation provision; and (3) a payment instruction (emphasis added). Paragraph 10 does not mention any further action that Cox or Snap is required to take before the shares vest. Similarly, Snap's repurchase option in Paragraph 9 reads: "Snap *has the ability* to purchase the options from Mr. Cox at any time subject to the foregoing . . ." (emphasis added). The clause goes on to announce similar date, valuation, and payment provisions. However, it does not in any way suggest that Snap was required to independently issue shares to Cox. Though both of these clauses do have date restrictions, they are written in present-tense language that suggests the purchase options vested upon execution of the contract. More importantly, neither of these paragraphs contemplates further action as a prerequisite to the parties' share redemption.

The details of the share transfer also suggest that the options vested when the Letter Agreement was executed. The contract speaks to the valuation of the shares, the timing and conditions of share redemption, restrictions on share transfers, and the put and call options available to both parties. The Agreement even dictates what will happen to Cox's options in the event that Snap executes a stock split. In short, the contract contains all the terms and conditions necessary to transfer the share options from Snap to Cox. There are no clear gaps in contractual language, and Snap has not pointed to anything that was missing from the Letter Agreement or that should have been included in any future "final agreement."

Snap nonetheless argues that the options were never issued because the contract contemplated "a final agreement" and other "necessary documentation." This argument fails because, among other things, under Virginia law nothing more was "necessary" to effect the transaction. *See* VA. CODE ANN. § 13.1-647(A); *Andrews*, 233 Va. at 58. Thus, having specified all the terms of the option transfer, the only remaining legal requirement was that Snap agree to the terms. It did so when its President, Navneet Gupta, signed his name next to Cox's at the bottom of the Letter Agreement.

In the alternative, even if these conflicting verb tenses and allusions to unspecified "final agreements" create a patent ambiguity in the contract, those terms will still be construed against Snap as the drafter of the document. *See Lott*, 827 F. Supp. 2d at 632; *see also Martin & Martin, Inc. v. Bradley Enterprises, Inc.*, 256 Va. 288, 291 (1998). Thus, regardless of whether the contract is deemed ambiguous or unambiguous, the terms governing the transfer of shares will be construed in Cox's favor.

### C. The Evidence Confirms that Snap Issued Cox Shares on January 12, 2006

Having interpreted the contractual language, the Court may consider extrinsic evidence to determine whether and when a breach occurred. *See, e.g., Bennett v. Sage Payment Sols., Inc.*, 282 Va. 49, 56 (2011) (using extrinsic evidence to determine whether a contract had been breached or repudiated). The evidence presented in this case confirms that Snap granted Cox his options on January 12, 2006 and therefore Snap breached its obligations when Cox exercised his option on March 18, 2011 and Cox failed to pay him within the five years contemplated by the Letter Agreement.

The language of the agreement in which Gupta bought out his partners illustrates that all three owners of Snap recognized that Cox owned five percent of the company. In fact, the owners left money on the table to pay for Cox's options, and the buy-out agreement specifically acknowledged Snap had promised five percent of the company's shares to Cox. Moreover, deposition testimony from Bali and Singh confirms that they recognized Cox's ownership interest in the company. *See* Singh Dep. 29:3-6 ("I'm aware we had given Mr. Cox about five percent of the company"); *see also* Bali Dep. 20:13-21 ("Well, for me, I mean, this agreement was the agreement which we talked about, you know, between Snap and Curtis for giving him stock option of five percent.").

The language in Larry Stern's email to Gupta on January 31, 2006 confirms this finding. In connection with the stock split, Stern notes that after the split, "the 3 of you will have 4,926,000 shares outstanding and then we'll issue options for up to 1,232,000 shares, with Mr. Cox owning 308,000 of them." These numbers are directly proportional to the numbers recited in the Letter Agreement. This email communication is not only important because of its content, but also because Gupta forwarded it to Cox just a few weeks after the Letter Agreement had been

signed. Thus, it shows that, as of January 31, 2006 at the very latest, both parties understood that Cox owned five percent of Snap in the form of stock options. Thus, when Snap refused to pay, it breached the contract and is now liable for damages.

### D. Damages

The value of the stock options that Snap owes Cox is governed by the clear language of the contract and is not subject to a genuine dispute. In regard to Cox's put option, the Letter Agreement states:

> The price shall be determined based on the excess of the then fair market value of Snap, with such value determined based on .8 times Snap's annual sales during the most recently preceding twelve-month period, in excess of the initial strike price.

The initial strike price is also defined by the language of the contract. Paragraph 3 reads:

> For the purposes of determining the strike price of the options issued pursuant to paragraph 1, the value of Snap will be based on a valuation of .8 times Snap's sales in calendar year 2005. This is estimated to be approximately $12,000,000.

Thus, the calculation of damages is subject to a straightforward formula: (80% of Snap's 2010 sales – the initial strike price) x .05 = the value of Cox's option.

The evidence reveals that Snap's 2005 revenue was $4,938,584. When multiplied by .8, this gives an initial strike price of $3,950,867. The fair market value of Snap at the time of redemption was $14,692,212, which represents the 2011 sales of $18,365,265 multiplied by .8. When $3,950,867 is subtracted from $14,692,212, it yields a final fair market value of $10,741,345. Five percent of this is $537,067.25, which signifies the amount owed to Cox under the terms of the contract.

Paragraph 10(b) of the Letter Agreement states that the amount owed to Cox was payable "over a five-year period with interest at the then-current prime rate." As of the date Cox exercised his option, the prime rate was 3.25%. When applied to the five years

15

following Cox's March 18, 2011 letter, the compound interest amounts to $100,800.17. Therefore, when interest is added to the value of Cox's stock options, the total amount owed to Cox is now $637,867.42. This analysis is detailed and confirmed by the unrebutted Expert Report of Zachary C. Reichenback and Lawrence M. Pullen, which Cox properly submitted in support of his motion for summary judgment.

## V. CONCLUSION

For the reasons stated above, the Court finds that Snap breached the January 12, 2006 Letter Agreement and is liable to Cox for the resulting damages. The instructions for calculating damages are written in clear language in the contract and are supported by an Expert Report. Therefore, Defendant's Motion for Summary Judgment will be denied. Plaintiff's Motion for Summary Judgment will be granted in full. An appropriate order shall issue.

September 20, 2016  
Alexandria, Virginia

/s/  
Liam O'Grady  
United States District Judge